**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michelle London-Marable and Frederick Marable, husband and wife,<br><br>          Plaintiffs,<br><br>v.<br><br>The Boeing Company, a Delaware Corporation; et al.,<br><br>          Defendants. | No. CV-04-2611-PHX-MHM<br><br>**ORDER** |

The Plaintiffs, husband and wife, filed this suit on November 19, 2004. (Dkt. #1). The Defendants moved to dismiss various claims against them on May 3, 2005. (Dkt. #8). In a March 26, 2006 Order, the Court granted in part and denied in part the Motion. (Dkt. #15). Notably, the Court held that the Plaintiffs' Counts V and VI (fraud and negligent misrepresentation) were preempted by the Employee Retirement Income Security Act ("ERISA") because those claims had a "connection with or reference to" an employee benefit plan. The Court allowed the Plaintiffs to amend the Complaint to name the proper defendants and seek appropriate relief under ERISA. (Id.)

The Third Amended Complaint named the appropriate defendants for each of the Plaintiffs' claims, dividing the claims into two categories: (1) claims applicable to the "Boeing Defendants," and (2) claims applicable to the "ERISA Defendants." (Dkt. #36). The ERISA Defendants moved for summary judgment on April 20, 2007 (Dkt. #63), which

1  the Court granted. (Dkt. #102). The Court now turns to the Summary Judgment Motion filed
2  by the Boeing Defendants. (Dkt. #84). After consideration of the pleadings and briefing
3  submitted in this case, the Court issues the following order.

### I. Standard of Review

5  A motion for summary judgment may be granted only if the moving party shows "that
6  there is no genuine issue of material fact and that the moving party is entitled to judgment
7  as a matter of law." Fed. R. Civ. P. 56(c). To defeat a motion, the non-moving party must
8  show that there are genuine factual issues "that properly can be resolved only by a finder of
9  fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty
10 Lobby, Inc., 477 U.S. 242, 250 (1986). The party opposing summary judgment "may not rest
11 upon mere allegations or denials of [the party's] pleadings, but . . . must set forth specific
12 facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). See also
13 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "[T]here
14 is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury
15 to return a verdict for that party." Anderson, 477 U.S. at 249.

### II. Background

17 Michelle London-Marable ("the Plaintiff") worked for Boeing for twenty-two years.
18 In 1999, she became a data processor. She held that title through the end of her employment
19 with Boeing in 2004. Her job required lifting heavy boxes, twisting and turning, squatting,
20 lifting over her shoulder, sorting paper, and keying in data.

21 In February 2001, the Plaintiff began treatment for severe abdominal pain. She
22 underwent surgery, during which it was discovered that she suffered from rirguirnal hernia.
23 She was on a medical leave of absence from January 12, 2001 through June 25, 2001. When
24 the Plaintiff returned from her surgery, she was required to be on light duty for six weeks and
25 could not lift more than ten pounds.

26 The Plaintiff underwent a second surgery on October 9, 2002 for cholecystitis and a
27 second rirguirnal hernia. She took a medical leave for her second surgery from October 8,
28 2002 until November 11, 2002. When she returned to work, she was restricted by her doctors

1 from lifting more than 25 pounds, turning, twisting, bending, squatting, and reaching over
2 her shoulder. Twisting and turning caused her intestine to be shifted, which caused her pain.
3 The Plaintiff was totally disabled as of October 9, 2002, and she has never recovered from
4 that disability.

5 The Plaintiff returned to Boeing on November 12, 2002 because she needed to be on
6 the payroll to continue her medical insurance. She also attempted to return to work because
7 she hoped that Boeing and/or its managers would find her another job within the company.
8 Co-defendant Morris, one of her supervisors, told the Plaintiff that Boeing was working on
9 finding her a suitable alternative job, which she asserts was a lie. The Plaintiff also asserts
10 that she was threatened that she would be laid off if she did not continue to do her work.

11 On November 20, 2002, the Plaintiff began to experience severe pain in her leg and
12 back, as well as shortness of breath. She called a supervisor, Defendant Morris, and asked
13 him to call the paramedics.

14 Boeing medical staff arrived at the Plaintiff's desk and helped her into a wheelchair
15 to take her to the medical department. There, a nurse put a hot towel on her stomach and left
16 her and closed the door. An on-site doctor came in and allegedly advised the Plaintiff that
17 she had "gas," and told her to see her primary care doctor. She asked the on-site doctor to
18 call her husband.

19 Someone from Boeing called the Plaintiff's husband, Frederick Marable, and he
20 arrived at Boeing shortly thereafter. The on-site doctor directed the Plaintiff's husband to
21 take her to her primary care doctor. Marable began threatening the doctor and Boeing with
22 a lawsuit, and so he was escorted from the premises. The paramedics were called, and they
23 took the Plaintiff to the hospital.

24 The Plaintiff returned to Boeing on December 3, 2002. Defendant Morris sent her
25 home, informing her that she had to leave because she could not do the required job duties
26 with her medical restrictions.

27 As of January 15, 2003, the Plaintiff was restricted by her doctor indefinitely from
28 repetitive twisting, turning, bending, squatting, or lifting 20 pounds or more. Despite being

- 3 -

1  told before returning to work that Boeing did not have a job for her to do, she returned to
2  work. She testified at her deposition that she took it upon herself to return because she was
3  running out of sick time and had no more vacation time.

4  When the Plaintiff arrived at work on January 15, she went to Boeing's medical
5  department to get her release paperwork, and then she went to her desk. She did not have
6  instructions about what to do at her desk; she sat at her desk and cried. After an hour and a
7  half to two hours, supervisors (and co-defendants) Morris and Koopman came to her desk
8  and told her she had to leave. They informed her that with her medical restrictions, she could
9  no longer perform her job. They escorted her to Boeing medical, where she was advised to
10 see Boeing's psychiatrist.

11 After speaking with employees from Boeing's human resources department, the
12 Plaintiff was escorted off of the premises by Morris and Koopman. January 15, 2003 is the
13 last day that she was physically present at Boeing.

14 The Boeing Defendants assert that at the end of January 2003, several changes were
15 made to the Plaintiff's workstation to accommodate her medical restrictions. The Plaintiff
16 responds that because she was escorted off the premises and not permitted to return, she has
17 no way of knowing whether any changes were made.

18 In February 2003, the Plaintiff called Boeing to get her leave of absence extended.
19 It was extended for two months, and the Plaintiff was informed that if she needed it extended
20 further, she simply needed to call in again.

21 Sometime after January 23, 2003, the Plaintiff asked Defendant Morris if Boeing had
22 come to any resolution about moving her to a different job. Morris informed her that he was
23 working on it. In January or February of 2003, the Plaintiff discussed returning to work with
24 Boeing employee Miguel Gonzalez. He informed her that she could only come back to work
25 if she could lift boxes. She told him that she was not going to come back and lift boxes.

26 As of February 2003, the Plaintiff was no longer working for Boeing or receiving any
27 benefits. She could not perform any work at all as of July 2, 2003. On August 18, 2003, the
28 Plaintiff called Boeing and asked if her medical leave could be extended through January 18,

2004. Her request was granted. Boeing extended the leave of absence again — on its own — through June 15, 2004.

The Plaintiff resigned from Boeing on April 19, 2004. She spoke with Boeing employee Christine Fisher to tell her that she was resigning, and Fisher asked the Plaintiff to write a letter with an explanation of her reasons. The Plaintiff responded with a May 21, 2004 letter to Fisher that explained her reasons for resigning. She resigned because of her physical disability, mental stress, and because she was not able to perform the duties of her job. She did not resign until April 2004 because she was waiting to resolve her appeal to Aetna (the benefits Plan Administrator) regarding her short-term disability benefits. After she sent in her May 21, 2004 letter, the Plaintiff began receiving Boeing retirement benefits.

Shortly after sending her May 21, 2004 letter, the Plaintiff called Boeing security to arrange to pick up her belongings. She and her husband traveled to Boeing and picked up her personal effects, which had been packed in five boxes, from the main lobby.

The Plaintiff and her husband filed suit in November 2004, alleging breach of the employment agreement, wrongful termination, negligent or intentional infliction of emotional distress, and loss of consortium.

### III. Discussion

A. Breach of the Employment Agreement (Count I)

The Plaintiff, while conceding that an employment relationship is at-will under Arizona law, bases her breach of contract claim on the "Mesa Management Team" memorandum that she received a copy of shortly before being injured on the job. She asserts that the Memo contains explicit promises, and therefore became an express term of her employment. She cites to the language from which she infers promissory intent:

> Keeping employees healthy and safe from work related injuries is one of our priorities at Boeing Mesa. When an injury occurs, our goal is to return the injured worker to an optimum level of health and performance as quickly as possible. This may require finding "light duty" placement while he or she is recovering from the occupational injury.

- 5 -

> I want to encourage all managers to find placements within their own departments for workers who have been hurt and are returning to the team. When that is not possible, Health Services will assist by seeking alternate work assignments for those employees. To facilitate the return of injured employees, Health Services will maintain a list of available temporary job assignments. Our goal is to return employees as quickly as possible to the workplace, even if that requires placing them in a "light duty" assignment.

(Dkt. #91). The Plaintiff asserts that the language constitutes "an explicit, express term and condition of [her] employment," and as such, "must be strictly enforced by the Court." (Id.)

The Court does not find that the Memo contained any promises on which the Plaintiff could reasonably rely. It does not require Boeing to take any specific action; it merely states the company's "goals" and "priorities." When a statement merely describes the employer's policies, "it is neither a promise nor a statement that could reasonably relied upon as a commitment." Demasse v. ITT Corp., 194 Ariz. 500, 505, 984 P.2d 1138, 1143 (1999). The Plaintiff could not reasonably conclude that the Memo constituted a commitment by Boeing. Id.; Roberson v. Wal-Mart Stores, Inc., 202 Ariz. 286, 291, 44 P.3d 164, 169 (Ariz. App. 2002).

The Plaintiff argues that summary disposition is inappropriate because "[w]hether there is a promise of job security or certain disciplinary procedures implied-in-fact by an employer through its personnel manual or otherwise is a *question of fact*." (Dkt. #91). The Court does not find this to be a genuine issue of material fact that precludes summary judgment. "Only disputes over material facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986).

Even if the Plaintiff were to succeed in convincing the trier of fact that the Memo should be incorporated into the parties' employment agreement, the Court finds, as a matter of law, that it does not obligate Boeing to do anything. Smith v. Melson, Inc., 135 Ariz. 119, 121, 659 P.2d 1264, 1266 (1983) ("The construction of a contract is a question of law where the terms of the agreement are plain and unambiguous."). The plain language of the Memo — using terms such as "one of our priorities," "goal," and "I want to encourage" —

- 6 -

unambiguously establishes that the document recites the goals and aspirations for the Mesa Management Team, and could not constitute a promise on which the Plaintiff could rely. Furthermore, the Plaintiff does not appear to be the intended recipient of the Memo; it is therefore unreasonable to infer promissory intent to act in any particular way for the Plaintiff's benefit. Accordingly, the Court finds that summary judgment should be granted in favor of the Defendants on Count I.

B. Constructive Discharge/Wrongful Termination (Count II)

The Plaintiff asserts that she was constructively discharged on April 19, 2004 when she resigned from Boeing. She says that the record is replete with "relevant, admissible evidence of intolerable working conditions, which were objectively difficult or unpleasant, and outrageous conduct" on the part of her employer. (Dkt. #91). She notes, by way of example, that she repeatedly told her employer that the "job was killing her"; she was threatened that if she did not work through her injuries, she would lose her job; when she was earning her degree, Defendants Taylor and Pontious told her that she needed to quit going to school because she was embarrassing her co-workers who did not have a similar level of education, and; some co-workers called her into a room and subjected her to a game of "hangman" using the letters of her name. (Id.)

In order to state a claim for constructive discharge under Arizona law, the Plaintiff must prove that her working conditions were so objectively difficult, or that the employer engaged in such outrageous conduct, that a reasonable employee would feel compelled to resign. A.R.S. § 23-1502(A)(1)-(B). The employee must also "[n]otify an appropriate representative of the employer, in writing, that a working condition exists that the employee believes is objectively so difficult that the employee feels compelled to resign or intends to resign." A.R.S. § 23-1502(B)(1). Notification is not required where the employer's conduct is sufficiently outrageous, such as when it involves sexual assault, threats of violence, or a continuous pattern of discriminatory harassment. A.R.S. § 23-1502(A)(2).

1  Here, the Plaintiff resigned with no notice on April 19, 2004. (Dkt. #85-4).[1]
2  Therefore, for her claim of constructive discharge to survive, she must demonstrate that there
3  is a genuine issue of material fact that her working conditions were so outrageous that a
4  reasonable person would feel compelled to resign. Fed. R. Civ. P. 56(c); A.R.S. § 23-
5  1502(A)(2).

6  When the Plaintiff resigned on April 19, 2004, she had been subject to no working
7  conditions more than a year due to her medical leave of absence. Furthermore, she had had
8  no interaction with anyone at Boeing for at least a year. The Court is unable to conclude,
9  therefore, that her employer's conduct compelled her to resign on April 19, 2004. Moreover,
10 the Plaintiff submitted a letter to Boeing on May 21, 2004, detailing the reasons for her
11 resignation. (Dkt. #85-4). In it, she stated that she had various reasons ultimately leading
12 to her resignation, the "most obvious reason" being her "physical disability and mental
13 stress." (Id.)[2] In light of the fact that the Plaintiff had not been subject to any working
14 conditions for more than a year, as well as the reasons she provided for her resignation, the
15 Court cannot conclude that the Plaintiff was constructively discharged.

16 In light of the Court's finding that the Plaintiff was not constructively discharged, the
17 Court does not reach the issue of whether her discharge was wrongful.

### C. Negligent and Intentional Infliction of Emotional Distress (Count III)

#### 1. Negligent Infliction of Emotional Distress

---

[1] A May 21, 2004 letter in the record contains the subject line "Resigned position as Data Processor, April 19, 2004." The letter opens with, "I apologize for the delay in responding to your request for my reason for resigning from Boeing."

[2] The letter goes on to detail the Plaintiff's complaints that the managers failed to find her a suitable alternative job when she returned from medical leave, as well as her complaints of discrimination and racism. (Id.)

- 8 -

The Plaintiff concedes that her negligent infliction of emotional distress claim is preempted under Arizona's Workers' Compensation laws. (Dkt. #91).

### 2. Intentional Infliction of Emotional Distress

The Plaintiff acknowledges that "it is extremely rare to find conduct in the employment context" that is sufficiently outrageous to support a claim for intentional infliction of emotional distress ("IIED"). (Id.); Mintz v. Bell Atl. Sys. Leasing, Int'l, Inc., 183 Ariz. 550, 554, 905 P.2d 559, 563 (1995). She also agrees that some of the conduct about which she complains occurred outside of the statutory limitations period, which in Arizona is two years. (Dkt. #91). She asserts, however, that the outrageous conduct at issue here is sufficiently documented in the record to support her claim, and is viable despite the two-year limitations period under the "continuing violation doctrine."

Under the continuing violation doctrine, a series of separate acts collectively constitute one unlawful employment practice. National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 103 (2002). It does not matter if some of the component acts fall outside the statutory time period; as long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered for purposes of determining liability." Id. National Railroad, however, addressed a claim under Title VII, and not a claim for IIED. Extreme and outrageous acts comprising a claim for IIED have been held to constitute separate and distinct torts, and not a continuing violation. Franklin v. City of Phoenix, No. CV-06-02316, 2007 WL 1463753, at *2 (D. Ariz. May 17, 2007); Floyd v. Donahue, 186 Ariz. 409, 414, 923 P.2d 875, 880 (Ariz. App. 1996). Accordingly, acts occurring outside the limitations period cannot support the Plaintiff's claim of IIED.

The Plaintiff sets forth the following acts within the limitations period that support her IIED claim:

1) She was told by Boeing management that she could not come back to work under any circumstances;

2) Despite a clear directive to all Boeing management to find "light duty" work for people like the Plaintiff, no one in the organization did anything to help her;

3) Boeing lied to Aetna about the job and the Plaintiff's working conditions;

4) Boeing extended her leave of absence through June 25, 2004.

(Dkt. #91). She asserts that "it is hard to fathom any conduct more outrageous or atrocious."

The question for the Court when considering a motion for summary judgment is whether there is any evidence "upon which a jury could properly proceed to find a verdict for the party producing it." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986). The inquiry requires the Court to make the initial determination of whether the evidence "is so one-sided that one party must prevail as a matter of law." Id. at 252. The Court finds here that the evidence provided by the Plaintiff for her IIED claim could not support a jury verdict, and accordingly, grants summary judgment in favor of the Defendants on Count III for the following reasons.

The Plaintiff agrees that she was totally disabled as of October 9, 2002. Accordingly, Boeing's refusal to allow the Plaintiff to return to work cannot constitute the basis for her IIED claim. A claim for IIED requires the defendant to have (1) engaged in conduct that was extreme and outrageous, (2) the defendant to have intended to cause emotional distress or to have recklessly disregarded the near certainty that such distress would result, and (3) the conduct must have actually caused severe emotional distress. Ford v. Revlon, 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987). The Court is unable to conclude that preventing the Plaintiff from returning to work amounts to IIED.

The Plaintiff's claim that Boeing refused to find her light duty work is similarly not actionable under a theory of IIED. As discussed previously, Boeing was not contractually obligated to find the Plaintiff an alternative assignment. The Court finds that the failure to do so does not constitute the type of extreme and outrageous conduct that the tort laws were designed to prevent or recompense.

As set forth in the Court's March 26, 2006 Order, any claims for fraud or negligent misrepresentation relating to an employee benefit plan are preempted by ERISA. (Dkt. #15). The Plaintiff has already had the opportunity to assert those claims against the appropriate

Defendants in the context of her ERISA claims, and it appears she did not do so.[3]  (See Response to ERISA Defendants' Motion for Summary Judgment, Dkt, #68 (asserting only a claim for failure to comply with ERISA's procedural requirements)).

Finally, the Court is unable to conclude that the extension of the Plaintiff's leave of absence amounts to extreme and outrageous conduct.  The Plaintiff has not put forth any credible evidence to suggest that extending the leave was intended to cause emotional distress, or that anyone at Boeing "recklessly disregarded the near certainty that such distress would result."  Furthermore, there is no credible evidence that Boeing's conduct in this regard actually caused emotional distress, much less *severe* emotional distress.

The Court finds that none of the grounds advanced for the Plaintiff's claim of IIED could support a jury verdict in her favor.  Anderson, 477 U.S. at 251.  Accordingly, summary judgment is granted in favor of the Defendants.

D.  Loss of Consortium (Count IV)

Loss of consortium is a derivative claim that can exist only once the directly injured spouse establishes all of the elements of the underlying cause of action.  Barnes v. Outlaw, 192 Ariz. 283, 286, 964 P.2d 484, 487 (1998).  In light of the foregoing rulings, Plaintiff Frederick Marable's loss of consortium claim cannot survive summary judgment.

### IV.  Conclusion

The Plaintiffs have failed to demonstrate a genuine issue of material fact precluding summary judgment on any of their claims.  Fed. R. Civ. P. 56(c).

Accordingly,

---

[3]Furthermore, even if the Plaintiff had properly asserted these claims against the Defendants, the Court cannot conclude that such conduct would amount to fraud or negligent misrepresentation.  In order to have qualified for short term disability benefits, the Plaintiff must have been unable to perform her duties as a Data Processor for *any* supervisor or employer.  (See Order granting ERISA Defendants' Motion for Summary Judgment, Dkt. #102).  Because Aetna defined "occupation" generally, rather than looking to the specific requirements imposed by the Plaintiff's employer, it would be legally irrelevant that the Defendants misrepresented the level of physical demand required.

1  **IT IS ORDERED** granting summary judgment in favor of the Defendants on all
2  claims against them. (Dkt. #84).

3  **IT IS FURTHER ORDERED** directing the Clerk to enter judgment accordingly.

4  DATED this 20th day of June, 2008.

_____
Mary H. Murguia
United States District Judge